UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| D.R. MASON CONSTRUCTION CO., <br><br> Plaintiff, <br><br> v. <br><br> GBOD, LLC, *et al.*, <br><br> Defendants. | Case No. 17-cv-01779-BAS-WVG <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** <br><br> **[ECF No. 6]** |

Plaintiff D.R. Mason Construction Company commenced this lawsuit against Defendants GBOD, LLC and Raymond Davoudi pursuant to the anti-fraud provisions of the Securities Exchange Act of 1934. (Compl. ¶¶ 1-2, ECF No. 1.) Plaintiff alleges that Defendants fraudulently induced it to invest in securities in exchange for work completed at a restaurant. (*Id.* ¶ 1.) Plaintiff claims it completed the work but never received the five percent ownership interest it was promised. (*Id.*)

Presently before the Court is Defendants' motion to dismiss Plaintiff's action for lack of subject matter jurisdiction. (Mot., ECF No. 6.) Defendants argue that

dismissal is proper because the purported investment agreement did not implicate federal securities laws. (*Id.*) Plaintiff opposes. (Opp'n, ECF No. 7.)

The Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the reasons that follow, the Court grants Defendants' motion to dismiss for lack of subject matter jurisdiction and dismisses Plaintiff's Complaint with leave to amend.

I.  BACKGROUND

Plaintiff D.R. Mason Construction Co. is a corporation with its principal place of business in San Diego, California. (Compl. ¶ 3.) In October 2014, Defendants GBOD, LLC and Raymond Davoudi "accepted a bid and retained Plaintiff as a general contractor to perform construction work at Meze, a restaurant in Downtown San Diego." (*Id.* ¶ 10.) GBOD, LLC, doing business as Meze Greek Fusion, is a California limited liability company with its principal place of business in San Diego. (*Id.* ¶ 6.) Davoudi resides in San Diego and is "an owner, CEO, a managing partner, and an officer at both GBOD and Meze." (*Id.* ¶ 7.)

Defendants allegedly hired Plaintiff to "oversee the project from interior design to completion." (Compl. ¶ 10.) Upon receiving its first check for $5,000 on November 3, 2014, Plaintiff began work on the restaurant. (*Id.* ¶ 11.) Over the following two weeks, Plaintiff received its second and third checks worth $15,000 and $20,000 respectively. (*Id.* ¶ 12.)

On November 19, 2014, "Defendants accepted a written bid proposal for the Project in the amount of $91,300" from Plaintiff. (Compl. ¶ 13.) "In addition to receiving $40,000 in compensation, an amount of $5,500 was credited against the account." (*Id.*)

Soon after, Plaintiff and Defendant Davoudi allegedly orally agreed to the following terms: (1) Plaintiff would receive a five percent ownership interest stake in Meze for the work that it already performed and had not been paid for, as well as

the work that it was going to perform at Meze, and (2) "Plaintiff would receive the first dividend payment as well as the certificates reflecting its five percent ownership interest in Meze in September 2015, three quarters after the New Year's grand opening of Meze." (Compl. ¶ 14.)

Plaintiff, allegedly relying on the oral agreement, continued performing services for Meze, which "increased the original contract price from $91,300.00 to $105,128.00." (Compl. ¶ 16.) "Defendants reiterated that Plaintiff would be compensated for the additional work performed by becoming a five percent shareholder of Meze in September 2015." (*Id.*) Plaintiff then allegedly completed its work on December 31, 2014, "just in time for the New Year's Eve Grand Opening." (*Id.*) Once the work was completed, Defendants allegedly claimed that they were unable to completely compensate Plaintiff for the work and so requested "that the balance of $1,000 be added to the remaining $68,625.00, and Plaintiff agreed." (*Id.* ¶ 18.)

Over the next few months, Defendants allegedly claimed repeatedly that "Plaintiff would receive the remaining balance of $69,625.00 by becoming a five percent shareholder of Meze and [would receive] dividend payments." (Compl. ¶ 19.) September 15, 2015, came and went, and Plaintiff allegedly did not receive "a certificate reflecting its ownership interest nor has it received any dividends." (*Id.* ¶ 26.)

Based on the foregoing, Plaintiff asserts the following eight causes of action: (1) breach of contract; (2) specific performance; (3) violation of Rules 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10-b5[1]; (4) violation of section 20(a) of the Exchange Act; (5) fraudulent inducement; (6) negligent misrepresentation; (7) California Securities Fraud; and (8) violations of California Business and Professions Code section 17200 et seq. (Compl. ¶¶ 29–79.)

---

[1] 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Plaintiff asserts that this Court has jurisdiction over counts three and four (its federal securities claims) pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. (Compl. ¶ 2.) Consequently, if the Court has jurisdiction over these counts, Plaintiff asserts that this Court has supplemental jurisdiction over Plaintiff's related state claims pursuant to 28 U.S.C. § 1367. (*Id.*) Defendants now move to dismiss Plaintiff's Complaint with prejudice, arguing that it fails to implicate federal securities laws, thereby failing to invoke federal question jurisdiction. (Mot.)

## II. LEGAL STANDARD

Under Rule 12 of the Federal Rules of Civil Procedure, a party may move to dismiss a claim based on a lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction" and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, "[a] federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). "[T]he burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377.

A plaintiff invoking this jurisdiction must show "the existence of whatever is essential to federal jurisdiction," and if the plaintiff fails to do so, the court "must dismiss the case, unless the defect [can] be corrected by amendment." *Tosco Corp. v. Cmtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001) (per curiam) (quoting *Smith v. McCullough*, 270 U.S. 456, 459 (1926)), *abrogated on other grounds by Hertz Corp v. Friend*, 559 U.S. 77 (2010).

A challenge to subject matter jurisdiction under Rule 12(b)(1) can be either facial or factual. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, the challenger asserts that the allegations in the complaint are insufficient to invoke federal jurisdiction. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039

(9th Cir. 2004). To resolve this challenge, the court limits its review to the allegations in the complaint, assumes the allegations in the complaint are true, and draws all reasonable inferences in favor of the party opposing dismissal. *Id.*; *see also Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

## III. DISCUSSION

Defendants facially challenge Plaintiff's Complaint, arguing that it fails to assert a substantial federal question. There is no federal question jurisdiction when the claim asserted is "insubstantial." *Hagans v. Lavine*, 415 U.S. 528, 537-38 (1974). A claim is insubstantial when "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." *Id.* at 538.

The potential source for a substantial federal question is Plaintiff's third claim for violation of the Exchange Act.[2] Section 10(b) of the Exchange Act prohibits (1) use of the mails or other instrumentality of interstate commerce (2) to use or employ a manipulative or deceptive device (3) in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b). Plaintiff alleges Defendants violated this provision in making false statements to fraudulently induce Plaintiff "to invest in Meze by constructing it without being fully compensated for the work." (Compl. ¶ 45.)

Defendants attack the substantiality of Plaintiff's claim on two grounds. First, they argue that the oral agreement at issue did not involve a security under federal

---

[2] Plaintiff's fourth claim invokes section 20(a) of the Exchange Act, which "provides for derivative liability of those who 'control' others found to be primarily liable under the 1934 Act." *In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002) (citing 15 U.S.C. § 78t(a)). Thus, this claim is derivative of Plaintiff's third claim and similarly fails if Plaintiff does not plead a federal question under its third claim. *See Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999) ("To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act."); *see also In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d at 1063 (finding that the pleading requirements for violations of sections 20(a) and 10(b) of the Exchange Act are the same).

law. (Mot. 6–9.) Second, Defendants claim Plaintiff fails to satisfy the interstate commerce element. (Mot. 10.) The Court agrees and consequently grants the Motion to Dismiss.

### A. "Security" Within the Meaning of the Federal Securities Laws

Section 10(b) of the Exchange Act is implicated when there is a "purchase or sale of any security." 15 U.S.C. § 78j(b). Section 2(a)(1) of the Securities Act of 1933 lists the financial instruments that qualify as securities:

> The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement . . . , investment contract . . . , or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(1). The scope of a "security" is "quite broad." *Marine Bank v. Weaver*, 455 U.S. 551, 555 (1982). The policy behind the Exchange Act was to "restore investors' confidence in the financial markets, and the term 'security' was meant to include 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Id.* at 555-56 (quoting H.R. Rep. No. 73-85, at 11 (1933)).

The statutory definition of a security under the Exchange Act includes ordinary stocks and bonds, along with the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits . . . ." *SEC v. Howey, Co.*, 328 U.S. 293, 299 (1946). "Thus, the coverage of the antifraud provisions of the securities laws is not limited to instruments traded at securities exchanges and over-the-counter markets, but extends to uncommon and irregular instruments." *Marine Bank*, 455 U.S. at 556 (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971)); *accord SEC v. M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943).

However, Congress "did not intend to provide a broad federal remedy for all fraud." *Marine Bank*, 455 U.S. at 556 (citing *Great W. Bank & Trust v. Kotz*, 532 F.2d 1252, 1253 (9th Cir. 1976)). Nor did Congress intend for the federal securities laws to be a "substitute for state fraud and breach of contract actions." *Robinson v. Glynn*, 349 F.3d 166, 175 (4th Cir. 2003) (quoting *Marine Bank*, 455 U.S. at 556).

Two tests used to determine whether a particular investment instrument constitutes a security under federal law are applicable to this case. When the investment instrument is "uncommon and irregular"—one that is not listed in the statute's definition—courts use the "*Howey* investment contract test." *See Howey*, 328 U.S. at 293. An investment contract, one of the enumerated types of securities in the Securities Act, is a "flexible principle," able to "meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

On the other hand, when the instrument at issue is "traditional stock," "there is no need . . . to look beyond the characteristics of the instrument to determine whether the [Securities] Acts apply." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686, 690 (1985) (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 850 (1975)). After all, traditional stock "represents to many people, both trained and untrained in business matters, the paradigm of a security." *Id.* at 693 (quoting *Daily v. Morgan*, 701 F.2d 496, 500 (5th Cir. 1983)). "Thus, persons trading in traditional stock likely have a high expectation that their activities are governed by the Acts." *Id.*

### 1. The "5 Percent Interest" Is Not a "Stock"

"[W]hen an instrument is both called 'stock' and bears stock's usual characteristics . . . there is no need . . . to look beyond the characteristics of the instrument to determine whether the [Securities] Acts apply." *Landreth*, 471 U.S. at 686, 690 (quoting *Forman*, 421 U.S. at 850). However, "the fact that instruments

bear the label 'stock' is not of itself sufficient to invoke the coverage of the Acts." *Id.* at 686. The instruments must also possess stock's usual characteristics. *Id.*

The five most common characteristics of stock are: (1) "the right to receive dividends contingent upon an apportionment of profits; (2) negotiability; (3) the ability to be pledged or hypothecated; (4) the conferring of voting rights in proportion to the number of shares owned; and (5) the capacity to appreciate in value." *Landreth*, 471 U.S. at 686 (citing *Forman*, 421 U.S. at 851).

*Forman* illustrates how the Supreme Court handled an irregular financial instrument that was labeled "stock." *See Forman*, 421 U.S. at 850-51. In that case, a non-profit housing cooperative sold shares of "stock" to prospective tenants. *Id.* at 842. The only purpose behind the stock, however, was to allow the tenant to acquire an apartment unit in the complex. *See id.* at 842-43. In other words, the stock was merely a recoverable deposit on the apartment. *See id.* Moreover, the stocks were non-transferable, were not able to be pledged or hypothecated, and did not grant voting rights. *See id.* at 842.

The Court concluded that the stock in the apartments did not constitute a security because it lacked the five most common features of traditional stock. *See Forman*, 421 U.S. at 851-52. Furthermore, the stock was not a security because the tenants bought the stock in order to acquire a living space, not to invest for profit. *See id.*; *see also Landreth*, 471 U.S. at 693 (concluding that the federal securities laws were implicated because the instrument at issue there—all of the outstanding stock in a lumber business—was "quintessential stock").

Here, Plaintiff contends that Defendants promised to give it "a five percent interest in Meze in exchange for the work it had performed and had not been compensated as well as the work that it was going to perform at Meze," and that "Plaintiff would receive the first dividend payment as well the certificates reflecting its five percent ownership interest in Meze on September 2015, three quarters after the [2014] New Year's Grand Opening of Meze." (Compl. ¶ 5.) Based on these

allegations, Plaintiff argues that the oral investment agreement between the parties involved a regulated security because the "Agreement at issue was for stock and ownership interest in Meze reflected by share certificates and dividend payments." (Opp'n at 7.) Plaintiff continues:

> Given that stocks are the type of instrument that fall within the ordinary concept of a security, and they are commonly thought to be a security, the Agreement at issue is the type of instrument that the Congress intended the securities laws to cover. Therefore, the Agreement here is considered to be a security within the Exchange Act's definition of a security.

(Opp'n at 7-8.)

The Court is unconvinced. Plaintiff's Complaint never mentions the word "stock." Rather, Plaintiff's pleading alleges Defendants promised it "a five percent interest in Meze." (Compl. ¶ 14.) *Landreth* applies when the "instrument *is both called stock* and bears stock's usual characteristics." *See Landreth*, 471 U.S. at 686 (emphasis added). People dealing with traditional stock "likely have a high expectation that their activities are governed by the [Exchange Act]." *See id.* at 693 (quoting *Morgan*, 701 F.2d at 500). But, when the agreement does not involve traditional stock or mention the word stock, the policy underlying this test is inapposite. *See id.*

Furthermore, although Plaintiff's Complaint does separately mention the term "shareholder," the Court will not draw the inference that this term means Plaintiff was promised traditional "stock." This inference would not be reasonable in these circumstances because Plaintiff alleges in its Complaint that Defendant GBOD is a limited liability company, not a corporation. (Compl. ¶ 3.) Under California law, LLCs distribute "membership interests," not shares of stock. *See* Cal. Corp. Code § 17704.07. Consequently, Plaintiff's pleading indicates the financial instrument at issue is not traditional stock. Moreover, courts tasked with deciding whether LLC membership interests constitute a security under the Exchange Act generally evaluate whether such interests are "investment contracts," not "stocks." *See, e.g.*, *Burnett v.*

*Rowzee*, No. SACV 07641 DOCANX, 2007 WL 2809769, at *4 (C.D. Cal. Sept. 26, 2007); *Affco Invs. 2001, L.L.C. v. Proskauer Rose, L.L.P.*, 625 F.3d 185, 189 (5th Cir. 2010); *United States v. Leonard*, 529 F.3d 83, 87 (2d Cir. 2008); *Robinson*, 349 F.3d at 170; *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 389 (D. Del. 2000).

Therefore, because Plaintiff does not allege Defendants promised it "stock," and because Plaintiff acknowledges Defendant GBOD is a limited liability company, the Court concludes Plaintiff does not allege the existence of a security under the traditional stock test from *Landreth*.

### 2. The "5 Percent Interest" Is Not an "Investment Contract"

The Securities Act's definition of a "security" encompasses an "investment contract." 15 U.S.C. § 77b(1). This term has been interpreted to reach "[n]ovel, uncommon, or irregular devices, whatever they appear to be . . . ." *Joiner Leasing*, 320 U.S. at 351. As mentioned above, it "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. The *Howey* Court devised the classic definition of an investment contract:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id.* at 298-99. In sum, the three requirements for establishing an investment contract are: (1) "an investment of money," (2) "in a common enterprise," and (3) "with profits to come solely from the efforts of others." *Id.* at 301.

While *Howey*'s third prong requires an expectation of profits solely from the efforts of the promoter or third party, "solely" does not require "a strict or literal limitation on the definition of an investment contract"; rather, the term "must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). Thus, the third prong requires that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.*

In addition to satisfying the three *Howey* requirements, plaintiffs seeking to demonstrate an "investment contract" must also satisfy a fourth requirement set forth in *Marine Bank*, 455 U.S. at 560. A plaintiff must show that the investment scheme was offered to several potential investors, not just to it. *Mace Neufeld Prods., Inc. v. Orion Pictures Corp.*, 860 F.2d 944, 946 (9th Cir. 1988) (quoting *Marine Bank*, 455 U.S. at 560). In other words, the plaintiff must demonstrate that the investment scheme was not a single unique agreement, negotiated one-on-one, without any intention of the investment agreement to be publicly traded. *Id.* (quoting *Marine Bank*, 455 U.S. at 560).

Here, Plaintiff does not plead sufficient facts to demonstrate all of the requirements for an investment agreement are satisfied. For example, Plaintiff does not plead facts regarding whether GBOD, LLC offered this same investment scheme to other investors or if it was just a unique, single agreement with Plaintiff. Moreover, Plaintiff fails to satisfy the third *Howey* prong because Plaintiff's allegations do not indicate whether under the terms of the agreement it was going to have essential managerial responsibilities in Meze. *See Turner Enters., Inc.*, 474 F.2d at 482.

Therefore, because Plaintiff fails to allege that Defendants offered the investment scheme to other investors, and because it does not allege what managerial responsibilities, if any, it was to have in Meze, the Court concludes that Plaintiff does not allege the existence of a security under the investment contract test from *Howey*.

In sum, Plaintiff's allegations do not demonstrate that the "5 percent interest" in GBOD, LLC is either traditional "stock" or an "investment contract" under the Securities Act. Consequently, Plaintiff's third claim fails to pose a substantial federal question because it does not involve the "purchase or sale of any security." *See* 15 U.S.C. § 78j(b). This claim is therefore subject to dismissal, but the Court will grant Plaintiff leave to amend because it may be able to plead additional facts addressing this issue. *See* Fed. R. Civ. P. 15(a).

### B. Instrumentality of Interstate Commerce

Defendants argue that Plaintiff fails to demonstrate the use of any instrumentality of interstate commerce in the alleged fraud. (Mot. 10.) Plaintiff counters that Defendants used the banking system, an instrumentality of interstate commerce, to deliver checks to Plaintiff for some of its services. (Opp'n 8.)

Section 10(b) of the Exchange Act requires that there be a "use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange." 15 U.S.C. § 78j. However, "[t]he use of an instrumentality of commerce need not be itself a fraudulent act; it suffices if the use is 'in furtherance of the alleged fraud.'" *Shepherd v. S3 Partners, LLC*, No. C-09-01405 RMW, 2011 WL 4831194, at *6 (N.D. Cal. Oct. 12, 2011) (quoting *Hilton v. Mumaw*, 522 F.2d 588, 602 (9th Cir. 1975)). Moreover, 15 U.S.C. § 78c defines "interstate commerce" in relevant part as:

> [T]rade, commerce, transportation, or communication among the several States . . . intrastate use of (A) any facility of a national securities exchange or of a telephone or other interstate means of communication, or (B) any other interstate instrumentality.

Here, Plaintiff contends that Defendants' "[u]se of the banking system to deliver checks to [it] as payment for some of [its] services constitutes a use of instrumentality of interstate commerce." (Opp'n at 8.) Although that may be true, the

Court is not persuaded that Plaintiff adequately pleads this instrumentality was used in furtherance of the alleged fraud.

Defendants allegedly hired Plaintiff to oversee construction of the Meze restaurant. (Compl. ¶ 10.) On November 3, 2014, upon receipt of a $5,000 check, "Plaintiff began work as described in the construction bid." (Compl. ¶ 11.) Then, Plaintiff received two more checks on November 6 and November 18, 2014, worth $15,000 and $20,000 respectively. (*Id.* ¶ 12.) Thus, the checks delivered by Defendants were for construction work Plaintiff already performed, not for any security.

Thereafter, on November 19, 2014, Plaintiff and Davoudi allegedly met in person and struck an oral agreement whereby Davoudi purportedly deceived Plaintiff by promising it a "5 percent interest in Meze in exchange for the work that it had performed and had not been compensated as well as the work that it was going to perform at Meze." (*Id.* ¶ 14.) This face-to-face agreement occurred after the three checks were delivered. Therefore, the Court fails to see how an alleged face-to-face agreement for an interest in Meze implicates the use of an instrumentality of interstate commerce.

Consequently, because Plaintiff pleads insufficient facts underlying how Defendants used an instrumentality of interstate commerce to further its purported fraudulent securities scheme, the Court concludes this element is not satisfied. That being said, the Court recognizes that the interstate commerce requirement is a low bar, and it is possible for Plaintiff to satisfy this requirement if it can provide sufficient facts showing that Defendants' use of the banking system—or any other instrumentality of interstate commerce—was "in furtherance of the alleged fraud." *See Hilton*, 522 F.2d at 602. The Court will therefore grant Plaintiff leave to amend to address this issue. *See* Fed. R. Civ. P. 15(a).

//

//

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's federal securities claims do not pose a substantial federal question and are subject to dismissal.[3] Thus, the Court **GRANTS** Defendants' Motion to Dismiss for lack of subject matter jurisdiction and **DISMISSES** Plaintiff's Complaint with leave to amend.

**IT IS SO ORDERED.**

DATED: March 13, 2018

Hon. Cynthia Bashant
United States District Judge

---

[3] Further, because the Court concludes it does not have original jurisdiction over any claims in Plaintiff's Complaint, there is no basis to exercise supplemental jurisdiction over Plaintiff's various state law claims. *See* 28 U.S.C. § 1367.